***********
The undersigned have reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Griffin and the briefs and arguments of the parties. The appealing party has not shown good grounds to reconsider the evidence, receive further evidence, or rehear the parties or their representatives. Having reviewed the competent evidence of record, the Full Commission adopts the Opinion and Award of Deputy Commissioner Griffin with minor modifications.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties as: *Page 2 
 STIPULATIONS
1. All parties are properly before the Industrial Commission, and the Commission has jurisdiction of the parties and of the subject matter.
2. All parties are subject to and bound by the North Carolina Workers' Compensation Act.
3. All parties have been properly designated and there is no question as to misjoinder or nonjoinder of parties.
4. Defendant is self-insured and the servicing agent on the claim is Gallagher Bassett Services.
5. An employment relationship existed between the employee and employer on January 12, 2007.
6. Plaintiff was employed on September 16, 1998; she worked as a balancer from September 16, 1998 until December 13, 1998; she worked at the RJS job from December 14, 1998; and she remains employed by Defendant although she has been on medical leave since August 24, 2007.
7. The parties have stipulated that Plaintiff's average weekly wage is $729.16, yielding a compensation rate of $486.32.
8. Plaintiff was out of work from December 15, 2006 to March 30, 2007 due to right and left carpal tunnel releases, which were performed on January 17, 2007 and March 1, 2007.
9. Plaintiff returned to work on April 1, 2007 at light duty for 4 to 6 weeks, and then returned to work at her regular job until August 24, 2007 when she was taken out of work due to left elbow pain. *Page 3 
10. Plaintiff underwent left arm ulnar nerve transposition surgery on October 25, 2007.
11. Plaintiff remains an employee of Defendant and has not been released to return to work without restrictions.
12. Plaintiff received a total of $7,511.12 in short term disability (STD) benefits for the period of December 15, 2006 to March 30, 2007; Plaintiff received a total of $10,771.33 in STD benefits for the period of August 24, 2007 through February 2, 2008; STD benefits will be paid through February 21, 2008 (for a total of 26 weeks); Plaintiff recently applied for long term disability (LTD) benefits, but no determination has yet been made on that claim; and Defendant contends it is entitled to a credit against any award of temporary total disability (TTD) compensation for these periods of disability. Plaintiff is concerned that any ERISA lien arising out of any of these STD or LTD payments be resolved from accrued TTD benefits before any credit issues are determined.
 ***********
The following were submitted before the Deputy Commissioner as:
 EXHIBITS
1. Stipulated Exhibit Number 1, Pre-Trial Agreement
2. Stipulated Exhibit Number 2, Medical Records, Industrial Commission Forms, Discovery Responses, Job Description Instructions for the Rapid-Ply Band Builder Models BC
3. Stipulated Exhibit Number 3, DVD of Plaintiff's job prepared by Defendant
 ***********
The following were received into evidence as:
 DEPOSITIONS *Page 4 
1. Oral deposition of David W. Schmidt, M.D., taken on July 14, 2008.
2. Oral deposition of Kenneth D. Shank, D.O., taken on July 25, 2008 with Plaintiff's Exhibits numbered 1 and 2 attached to the deposition transcript.
3. Oral deposition of Steven Sanford, M.D., taken on August 5, 2008 with Deposition Exhibit Number 1 attached to the deposition transcript.
 ***********
The following were submitted to the Deputy Commissioner as:
 ISSUES
1. Whether Plaintiff sustained an injury by accident or occupational disease to her right hand and left hand, left elbow and left upper extremity arising out of and in the course of her employment with Defendant on or about January 12, 2007.
2. To what, if any, other benefits Plaintiff is entitled to receive as a result of any injury by accident or occupational disease.
3. Whether Defendant is entitled to a credit for short-term and long-term disability benefits which were fully-funded by Defendant and which were paid to Plaintiff during any compensable periods of disability pursuant to N.C. Gen. Stat. § 97-42.
 ***********
Based upon all of the competent credible evidence in the record, the Full Commission makes the following:
 FINDINGS OF FACT
1. At the time of the hearing before the undersigned, Plaintiff was 46 years old. Plaintiff completed the 10th grade and subsequently obtained her GED. *Page 5 
2. In September of 1998, Plaintiff began her employment with Defendant. Beginning in December of 1998, and for the following 9 years of her employment with Defendant, Plaintiff has worked as an RJS splicer.
3. An RJS splicer works with a co-employee, a "builder," to build bands to form tires. To build the bands, the RJS splicer pulls rubber plies down a table and cuts a 45-degree angle into the rubber plies. The RJS splicer then feeds the rubber plies into a machine, which converts the material into a band around a drum. Once the band is built around the drum, both the builder and the RJS splicer pull the band off of the drum by holding onto the edge of the band with their fingers down and thumbs up. At times, the bands can be difficult to remove, which requires the RJS splicer and builder to exert themselves more than usual to push and pull the band off of the drum.
4. The RJS machine constructs different size bands depending on the specification ordered. The number of plies in a particular band varies between 2-ply, 4-ply, 6-ply and 8-ply. The method of building the bands is the same regardless of the number of plies a band contains. The more plies a band has, the heavier the band.
5. Some of the tires built by Defendant have specifications to have gum placed in between the bands, and this gum is loaded into the back of the RJS band-building machine. The gum causes the bands to appear different and to weigh more. The builder and the RJS splicer are responsible for putting the drums of gum and spools of banding material on the back of the machine.
6. After production, the bands are removed from the back of the RJS machine and hung on a "booking tree." A booking tree consists of an upright metal pole with a right-angle *Page 6 
arm. The normal height of the booking tree with which Plaintiff worked on a regular basis was approximately the same height as Plaintiff, 5 feet 4 inches.
7. To place the bands on the booking tree, a cloth liner is first placed over the booking tree. Next, the RJS splicer and the builder place the band over the liner and roll it like a yoga mat up to the top of the booking tree. Plaintiff testified that she had to raise her left elbow above her head to place the band on the tree and to roll the band as needed. The Full Commission finds Plaintiff's testimony regarding her job activities to be credible.
8. After the bands were rolled-up, the bands would be removed by either by Plaintiff alone or with assistance from the builder. Depending on their size, the rolled-up bands were transported to a designated cart either by walking them or by wagon.
9. In 2005, Plaintiff began experiencing problems with her hands and left arm. On September 27, 2005, she presented to Dr. Kenneth Shank reporting pain in her hands, knees, shoulders and elbows. She also reported fatigue and depression, which pre-existed the development of her physical problems. Dr. Shank's assessment was arthritis and depression. Plaintiff returned to work for Defendant as an RJS splicer and continued to work in that position until December 15, 2006.
10. On December 14, 2006, Plaintiff returned to Dr. Shank with complaints of pain in her left elbow with numbness, weakness and tingling in her hands. Dr. Shank noted that Plaintiff's Phalen's test was positive within seconds and that her Tinel's sign was positive bilaterally. An EMG study revealed bilateral carpal tunnel syndrome, which was more severe in Plaintiff's right hand.
11. Dr. Shank referred Plaintiff to Dr. Steven Sanford for further evaluation and treatment. Dr. Sanford diagnosed bilateral carpal tunnel syndrome and performed carpal tunnel *Page 7 
release on Plaintiff's right hand on January 18, 2007 and on Plaintiff's left hand on March 1, 2007. As a result of the bilateral carpal tunnel syndrome, Plaintiff was unable to work from December 15, 2006 through March 30, 2007.
12. With respect to Plaintiff's claim for bilateral carpal tunnel syndrome, after deposing Dr. Shank, Dr. Schmidt and Dr. Sanford, Defendant has acknowledged that Plaintiff's job as an RJS splicer placed her at a greater risk than the general public for contracting, and significantly contributed to her development of, bilateral carpal tunnel syndrome. Based on a review of the competent credible evidence of record and Defendant's acknowledgment on the issue, the Full Commission finds as fact that Plaintiff contracted the occupational disease of bilateral carpal tunnel syndrome as a direct result of her employment with Defendant.
13. Based on the testimony of Dr. Sanford, the Full Commission finds that had Plaintiff reached maximum medical improvement for her bilateral carpal tunnel syndrome as of October 12, 2007. As a result of her bilateral carpal tunnel syndrome, Plaintiff retains a 5% permanent partial disability rating to each hand.
14. Following her bilateral carpal tunnel releases, Plaintiff returned to work on April 1, 2007 in a light-duty capacity for 4 to 6 weeks. Thereafter, Plaintiff returned to her regular job and continued to work in that capacity until she was taken out of work by Dr. Shank on August 24, 2007 for left elbow pain. Plaintiff has not returned to work since that time.
15. After returning to work in April of 2007, Plaintiff continued to experience pain in her left elbow region. Between June and September 2007, Plaintiff returned to Dr. Shank and Dr. Joseph Zucker with complaints of pain localized in her left elbow region. From August 24, 2007 through September 10, 2007, Dr. Shank wrote Plaintiff out of work due to her elbow. Due to her elbow complaints, Dr. Zucker wrote Plaintiff out of work until October 22, 2007. *Page 8 
16. On October 12, 2007, Plaintiff returned to Dr. Sanford with continued complaints of pain in the medial elbow and numbness and tingling in the ulnar nerve distribution. Dr. Sanford assessed Plaintiff with left cubital tunnel syndrome. On October 25, 2007, Dr. Sanford performed an ulnar nerve transposition on Plaintiff's left elbow. Plaintiff participated in another course of therapy from October 29, 2007 through December 31, 2007.
17. Dr. Shank and Dr. Schmidt each opined, based on Plaintiff's description of her job activities, that Plaintiff's employment with Defendant exposed her to a greater risk than that of the general public for developing left cubital tunnel syndrome, and that Plaintiff's employment significantly contributed to her development of that condition.
18. After viewing a DVD made by Defendant of an employee performing the duties of an RJS splicer, and based on the amount of flexion and extension of the elbow with force depicted on the DVD, Dr. Sanford opined that the RJS splicer position as shown in the DVD did not place Plaintiff at an increased risk for developing cubital tunnel syndrome. However, after being presented with the differences described by Plaintiff between her job activities and those portrayed on the DVD, including Plaintiff's description of having to flex and extend her elbow over her head to pull a band onto a booking tree based on her height and the height of the booking tree she used on a regular basis, as well as the fact that Plaintiff tended to make heavier bands than those portrayed in the DVD at a faster rate than was portrayed in the DVD, Dr. Sanford amended his opinion. Based on Plaintiff's description of her job activities as an RJS splitter, Dr. Sanford opined that Plaintiff's job placed her at an increased risk for developing left cubital tunnel syndrome as compared to the general public not so employed. Dr. Sanford further opined that Plaintiff's job significantly contributed to her development of left cubital tunnel syndrome. *Page 9 
19. Based on the greater weight of the competent evidence of record, including the testimony of Plaintiff and of other employee of Defendant as well as the DVD prepared by Defendant, the Full Commission finds Plaintiff's description of her job duties as an RJS splicer, including her description of flexing and extending the elbow, to be more credible than the job duties portrayed in the DVD as evidence of the physical motions required by Plaintiff to perform her job duties.
20. Therefore, the Full Commission finds, based on the competent evidence of record, including the opinions of Dr. Shank, Dr. Schmidt and Dr. Sanford, that Plaintiff's job as an RJS splicer placed her at an increased risk of developing left cubital tunnel syndrome as compared to the general public not so employed. The Full Commission further finds that Plaintiff's job significantly contributed to the development of her left cubital tunnel syndrome.
21. On September 19, 2007, Plaintiff began treating with Mary Greene for her depression at the recommendation of Dr. Shank. The history taken by Ms. Greene detailed Plaintiff's medical problems with her hands and elbow and her frustration with her inability to work, as well as several other personal family crises.
22. Dr. Shank is the only medical physician who has evaluated and addressed Plaintiff's depression. As a board-certified family practitioner, Dr. Shank is qualified to render an opinion regarding the causal relationship between Plaintiff's compensable occupational diseases and the material aggravation of her depression. Dr. Shank opined, and the Full Commission finds as fact, that Plaintiff's pre-existing depression was materially aggravated by her left cubital tunnel syndrome. The Full Commission further finds that Plaintiff is in need of psychological counseling to address this problem. *Page 10 
23. In regard to Plaintiff's ability to return to work following treatment for her left cubital tunnel syndrome, Dr. Sanford deferred to the opinion of Plaintiff's treating family physician, Dr. Shank.
24. Dr. Shank opined that, as of the date of his deposition, Plaintiff remains disabled from work. Dr. Shank explained that it would be very difficult for Plaintiff to perform any type of physical work, and he has completely restricted her from performing any lifting with her left arm.
25. Plaintiff has moved for an award of attorneys' fees for the cost of defending this appeal pursuant to N.C. Gen. Stat. § 97-88.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission enters the following:
 CONCLUSIONS OF LAW
1. Plaintiff contracted an occupational disease in the form of bilateral carpal tunnel syndrome, which was proximately caused by causes and conditions characteristic of and peculiar to Plaintiff's employment with Defendant. N.C. Gen. Stat. § 97-53(13).
2. Plaintiff's position as an RJS splicer, and the job duties associated therewith, placed Plaintiff at an increased risk of developing left cubital tunnel syndrome when compared to the general public not so employed. In addition, Plaintiff's position significantly contributed to the development of her left cubital tunnel syndrome. Plaintiff's left cubital tunnel syndrome accordingly constitutes a compensable occupational disease. N.C. Gen. Stat. § 97-53(13).
3. As a result of the contraction of her compensable left cubital tunnel syndrome, Plaintiff sustained a material aggravation of her pre-existing depression. That depression is *Page 11 
therefore also a compensable condition. Bowen v. ABF FreightSystems, Inc., 179 N.C.App. 323, 336, 633 S.E.2d 854, 862 (2006).
4. As a result of her contracting bilateral carpal tunnel syndrome, Plaintiff is entitled to receive temporary total disability benefits at the weekly compensation rate of $486.32 from December 15, 2006 to March 30, 2007. N.C. Gen. Stat. § 97-29.
5. As a direct and proximate result of her contracting left cubital tunnel syndrome, Plaintiff is incapable of earning wages which she was receiving at the time of her contraction of the occupational diseases at the same or in any other employment. Plaintiff is therefore entitled to receive temporary total disability benefits at the weekly compensation rate of $486.32 from August 24, 2007 and continuing until Plaintiff returns to work or further Order of the Industrial Commission. N.C. Gen. Stat. § 97-29; Russell v. Lowes Prod. Distribution,108 N.C. App. 762, 765, 425 S.E.2d 454, 457 (1993).
6. As a result of her compensable occupational diseases of bilateral carpal tunnel syndrome and left cubital tunnel syndrome and her related depression, Plaintiff has received medical treatment and is entitled to receive further medical treatment that would effect a cure, give relief or lessen her period of disability for each of those conditions, subject to the limitations of N.C. Gen. Stat. § 97-25.1. N.C. Gen. Stat. § 97-25.
7. Defendant is entitled to a credit for short-term and long-term disability benefits paid to Plaintiff, on a week-for-week basis. N.C. Gen. Stat. § 97-42.
8. Plaintiff is entitled to receive reasonable attorneys' fees for the costs of defending the appeal in this matter. N.C. Gen. Stat. § 97-88.
 *********** *Page 12 
Based upon the foregoing stipulations, findings of fact, and conclusions of law, the Full Commission makes the following:
 AWARD
1. Subject to the reasonable attorney's fee approved herein, Defendant shall pay to Plaintiff temporary total disability compensation, payable at the weekly rate of $486.32, from December 15, 2006 to March 30, 2007. Such compensation has accrued, and is payable in a lump sum. Defendant is entitled to a credit against this amount for any short-term and long-term disability benefits paid to Plaintiff during that time, on a week-for-week basis.
2. Subject to the reasonable attorney's fee approved herein, Defendant shall pay temporary total disability compensation, payable at the weekly rate of $486.32, from August 24, 2007 and continuing until Plaintiff returns to work or further Order of the Industrial Commission. Such compensation as has accrued shall be paid in a lump sum. Defendant is entitled to a credit against this amount for any short-term and long-term disability benefits paid to Plaintiff during that time, on a week-for-week basis
3. Defendant shall pay all medical expenses incurred and to be incurred as a result of Plaintiff's contraction of bilateral carpal tunnel syndrome and left cubital tunnel syndrome and related depression when bills for the same have been approved pursuant to Industrial Commission procedures, for so long as such evaluations, treatments and examinations may reasonably be required to effect a cure, give relief and/or lessen Plaintiff's period of disability.
4. A reasonable attorney's fee of 25% of the compensation due Plaintiff under Paragraphs 1 and 2 of this award is approved for Plaintiff's counsel and shall be paid by Defendant as follows: 25% of the accrued compensation due Plaintiff after Defendant's credit has been accounted for shall be deducted from said compensation and shall be paid in one lump *Page 13 
sum directly to Plaintiff's counsel; thereafter, Plaintiff's counsel shall be paid every fourth check due Plaintiff.
5. Defendant shall pay the costs.
6. Plaintiff shall submit an affidavit detailing the attorney and staff time spent defending this appeal. As part of the costs of this action, Defendant shall pay to Plaintiff's counsel a reasonable attorney's fee which shall be determined by the Full Commission based upon Plaintiff's affidavit.
This the 23rd day of October, 2009.
S/___________________ DIANNE C. SELLERS COMMISSIONER
CONCURRING:
 S/___________________ STACI T. MEYER COMMISSIONER
 S/___________________ LAURA K. MAVRETIC COMMISSIONER *Page 1